**WHEATON INDUSTRIES RETIREE BENEFIT PLAN, et al., Plaintiffs,**

**v.**

**GLASS, POTTERY, PLASTICS & ALLIED WORKERS EMPLOYERS RETIREE BENEFIT TRUST, et al., Defendants.**

Civ. A. No. 86–1205.

United States District Court,
E.D. Pennsylvania.

July 27, 1988.

George E. Moore, Philadelphia, Pa., for plaintiffs.

Henry Kolowrat, Philadelphia, Pa., for defendants.

### MEMORANDUM

LOUIS H. POLLAK, District Judge.

This case, brought under the Employee Retirement Income Security Act

("ERISA"), 29 U.S.C.A. § 1104, and the Labor Management Relations Act ("LMRA"), 29 U.S.C.A. §§ 185, 186(c)(5), is before this court on defendants' motion for summary judgment. The plaintiffs are Wheaton Industries, an ex-member of defendant G.P.P.A.W.—Employers Retiree Trust ("GPPAW Trust" or "Trust"), and Wheaton's own, new employee retirement benefits trust fund, which is alleged in the complaint to be assignee and subrogee of the rights of retirees and spouses to any proceeds from the Trust. Defendants are the GPPAW Trust, a multi-employer, pooled-risk, employee-benefits trust fund, and its six trustees.

Wheaton, a contributor to the Trust from 1968 until 1986, announced its withdrawal from the Trust in late 1983 and early 1984. The parties agree that the Trust agreement calls for the segregation of a fund that will continue to make payments to beneficiaries of withdrawing employers; they disagree about the size of the fund. The plaintiffs claim that the Trust's refusal to pay investment income on Wheaton's contributions to the Trust violated the terms governing employer withdrawal set forth in the Trust Agreement. Defendants contend that the trustees' decision to refund Wheaton's contributions but not the investment income earned thereon was within the broad discretion conferred by law on the trustees. For the reasons set forth in this Memorandum, the defendants' motion for summary judgment is denied. An appropriate order follows the Memorandum.

### Background

Under collective bargaining agreements between Wheaton's various plants and the Glass, Pottery, Plastics & Allied Workers International Union (GPPAWIU), Wheaton paid a per-hour contribution into the Trust until it withdrew from the Trust to set up its own benefits plan, the Wheaton Industries Retiree Benefit Plan. Amounts contributed to the Trust by Wheaton were pooled and invested together with amounts contributed by other employers participating in the Plan.

The parties agree that Wheaton's withdrawal from the Trust constituted a "partial termination" within the meaning of the Trust agreement. Section 11.03 of the Trust agreement, entitled *"partial termination,"* provides, in relevant part, that:

Upon ... partial termination of this Trust Agreement, said ... employer ... shall cease its Contributions ... to this Fund; and, further, upon any such event, the Trustees shall request the Fund Actuary to determine on the basis of actuarial methods, factors and assumptions consistent with those used in the past management of the Fund, the portion of the Fund assets held with respect to such ... Employer ... and from such portion of the Fund the Trustees shall pay or provide for the payment of all obligations of the Fund applicable thereto and shall pay or provide for the payment of any remaining balance thereof to or for the benefit of the persons in such group who, had they remained covered by this Trust Agreement, would have qualified as Retired Employees, or the spouses or beneficiaries of such Retirees in such a manner as will, in the opinion of the Trustees, best effectuate the purposes of the fund to provide the benefits called for hereunder for such group of persons ...

When Wheaton withdrew, the Trust treated Wheaton as six separate employers, based on six segments of the company that withdrew at separate times because of the different expiration dates of their collective bargaining agreements. According to the Trust's calculation of the "assets" attributable to the segments, three of the six segments came out with a negative balance, and three with a positive balance of contributions received over benefits paid out.[1] *Defendants' Memorandum in Support of Their Motion for Summary Judgment,* at 2. Aggregating the positive balances (counting contributions only, and not investment income therefrom), the Trust de-

---

1. The Trust states that, as a "pooled-risk" plan, it does not charge employers whose benefits exceed contributions at the date of the employer's withdrawal from the plan. *Defendants' Memorandum in Support of Their Motion for Summary Judgment,* at 2.

termined that the assets due to Wheaton's retirees amounted to $177,000.[2]

Plaintiffs, however, contend that the segmentation of the company is irrelevant. In plaintiffs' view, because they deserve the contributions *plus* investment income therefrom, they have a positive net balance with respect to all of the six segments to which defendants refer, so that the segmentation turns out to be inconsequential. Plaintiffs contend that as of June 30, 1986, they were entitled to $890,000, and are now entitled to even more since the close of the fiscal year, 1987.[3]

The defendants maintain that the Trust's decision concerning the allocation of funds to Wheaton's segregated account was necessitated by the Trust's precarious economic situation. Both in their brief and oral argument, the defendants describe the decline in the glass industry, the subsequent decline in the number of active workers, and the rapid rate of medical inflation. *See Defendants' Memorandum in Support of Their Motion for Summary Judgment*, at 9–12; *Transcript of Oral Argument*, Doc. No. 23, at 2–5. Defendants have also submitted the reports of the Trust's actuaries which indicate that substantial cost-cutting and revenue-producing measures were necessary to ensure the continued viability of the Trust.[4]

The defendants offer two central arguments in support of the trustees' action with respect to Wheaton's withdrawal. First, the defendants stress the reasonableness of the Trust's treatment of Wheaton. They characterize the Trust's decision not to credit Wheaton's segregated account with investment income as a "middle of the road" position, arguing that the Trust acted in accordance with its fiduciary duty by rejecting the more "extreme" approaches to partial termination situations, such as immediate cessation of coverage for withdrawing employer's beneficiaries or segregation of investment income with employer contribution, the alternative demanded by the plaintiffs. *Defendants' Memorandum in Support of Their Motion for Summary Judgment*, at 14. The plaintiffs respond that the plain language of § 11.03 forecloses adoption of the Trust's interpretation.

The defendants' second argument rests on the Trust's past practice with respect to withdrawing employers. They point to the passage in § 11.03 of the Trust agreement that contemplates consideration of "past management" practices in the actuarial calculation of what belongs to the withdrawing employer's beneficiaries. *See Defendants' Memorandum in Support of Their Motion for Summary Judgment*, at 9. The plaintiffs counter that past interpretation of § 11.03 cannot justify continued adoption of a clearly erroneous interpretation of the Trust agreement. In addition, they maintain that past practice is not relevant because such prior practice was itself informed by inaccurate and inadequate actuarial reporting. *See Plaintiffs' Memo-*

---

**2.** According to the Trust, the "deficits" that would have been charged to Wheaton had it not received the pooled-risk treatment provided for under the Plan would have amounted to $241,534, and would have left Wheaton with a net negative balance at the date of withdrawal. *Id.*

**3.** Paragraph 29 of plaintiffs' complaint alleges in part that "[t]he total amount of assets held with respect to Wheaton which has not been properly segregated cannot be determined by plaintiffs without access to GPPAW Trust records, but is believed to be in excess of $1,000,000.00."

**4.** The plaintiffs contest the assertion by defendants that the trustees excluded investment earnings from Wheaton's segregated account to ensure the continued viability of the Trust. *See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment*, at 9. In addition, the plaintiffs challenge the exten-

siveness of the actuarial studies on which the trustees based their decision to exclude investment income. In the plaintiffs' view, the trustees did not adhere to the requirement in § 11.03 of the Trust agreement that the Trust request the

> Fund actuary to determine on the basis of actuarial methods, factors, and assumptions consistent with those used in past management of the Fund, the portion of the Fund assets held with respect to such former Employer ...

According to the plaintiffs, the defendants' failure to request and to receive a full actuarial report concerning Wheaton's assets supports the plaintiffs' claim that the trustees' action was not based on a concern for the future viability of the Trust.

*randum in Opposition to Defendants' Motion for Summary Judgement*, at 34.

### Discussion

■■■ To defeat the defendants' motion for summary judgment, plaintiffs must make a showing sufficient for a reasonable factfinder to conclude that the Trust had an obligation to pay investment income on Wheaton's contributions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This showing must be made in light of the substantive evidentiary standard of proof that would apply at the trial on the merits. *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. The parties dispute whether the standard of review to be applied to the Trust's allocation of Wheaton's funds is the deferential arbitrary and capricious standard or the more exacting de novo standard.[5] It does not seem necessary to determine which standard of review is appropriate to this case, because the plaintiffs have offered enough evidence for a reasonable factfinder to conclude that the Trust's decision to withhold investment income on the funds segregated for payment to Wheaton's beneficiaries was a clearly unreasonable construction in light of the language of the Trust agreement.

The Trustees have an obligation under ERISA, 29 U.S.C. § 1104(a)(1)(D), to comply with the language of the Trust agreement. The Trust agreement in this case provides, in § 11.03, for a withdrawing employer's entitlement to "assets"—not "contributions." "Contributions" are defined in the Trust agreement as the amounts required to be paid to the Fund by contributing employers. *See* Trust Agreement,

§ 1.10. If the parties to the Trust agreement wanted to ensure that employers would be entitled only to "contributions" upon withdrawal, they would have so indicated in § 11.03 and would not have chosen "assets" to describe withdrawing employers' entitlement.

Even under the arbitrary and capricious standard, the trustees' reading of the Trust agreement will not be upheld if it contravenes the plain meaning of the Trust's terms. *See, e.g., Wolf v. National Shopmen Pension Fund*, 728 F.2d 182, 187–88 (3d Cir.1984) (invalidating decision of Trust under arbitrary and capricious standard of review because trustees' reading was "not rational").

The defendants' justifications for stretching the language of the Trust agreement are not sufficiently persuasive to justify summary judgment even under the arbitrary and capricious standard. First, the defendants argue that the trustees decided to withhold investment income based on detailed actuarial reports. These reports, they claim, reveal that the Trust faced severe economic difficulties and hence bolster the reasonableness of the trustees' decision not to credit withdrawing employers with investment income. Although the process by which the trustees arrived at their decision to withhold investment income appears rational from the perspective of the Trust's own financial well-being, it does not appear rational under the Trust agreement's existing terms. Indeed, the description of the trustees' decision reads like a process leading up to the drafting of some entirely new Trust agreement terms. *See Defendants' Memorandum in Support of Their Motion for Summary Judgment*, at 14 (describing actuarial input into trustees' deci-

---

5. The plaintiffs argue that the Trust's decision should be subject to *de novo* review, based on recent decisions in the Third Circuit that stress the importance of context—particularly factors relating to the impartiality of the trustees—in determining the appropriate standard. *See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment*, at 14 (citing *Bruch v. Firestone Tire and Rubber Co.*, 828 F.2d 134 (3d Cir.1987), *cert. granted*, — U.S. ——, 108 S.Ct. 1288, 99 L.Ed.2d 498 (1988) and *Teamsters Local 115 v. Yahn & McDonnell,*

*Inc.*, 787 F.2d 128 (3d Cir.1986), *aff'd without opinion by an equally divided Court*, — U.S. ——, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987)).

The defendants argue that the trustees' actions should be subject to the more deferential arbitrary and capricious standard, because the trustees are disinterested administrators acting within their legally-recognized role of allocating resources among various groups of beneficiaries. *See Defendants' Reply in Support of Their Motion for Summary Judgment*, at 2—7.

sion) & *Exhibit "A"* attached thereto (Report of Hewitt Associates, the Trust's actuaries). The defendants' claim that the trustees' decision was a prudent one for the Trust does not, on its face, appear to justify disregarding the language of § 11.03.

Second, the defendants claim that it would be inequitable for the Trust to pay investment income to a withdrawing employer given the Trust's status as a partially capitalized "pooled-risk" entity. However, it is not apparent beyond doubt that a withdrawing employer's entitlement to investment income is in fact incompatible with this "pooled-risk" Trust.

Under the "pooled-risk" provisions of the Trust, contributing employers made payments to the Trust without assigning their contributions to particular periods. If payments exceeded what was needed to pay the benefits due in a current period, the remainder was capitalized for use in future periods. In the defendants' view, the plaintiffs' claim for investment income amounts to an unwillingness to accept the responsibilities along with the benefits of a pooled-risk arrangement.[6]

There are two distinct periods during which Wheaton may have a claim to investment income: the period during which Wheaton was a contributor to the Trust (any point prior to Wheaton's withdrawal) and the period after the establishment of a segregated fund (any point after Wheaton's withdrawal). The defendants have not proffered sufficient evidence to support their claim of undue benefit for either period. Without such a showing, the defendants cannot prevail on summary judgment because the plaintiffs have established the existence of the essential elements of their case through the language of the Trust agreement. *See Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

The claim of undue benefit with respect to the period prior to Wheaton's withdrawal requires actuarial data indicating that the Trust allocated the investment income that accrued on Wheaton's contributions to cover Wheaton's share of risk during its participation in the plan. The defendants have not presented such data. Moreover, the defendants' claim of unjust benefit is substantially weaker with respect to the interest that has accrued on Wheaton's segregated fund since the time of Wheaton's withdrawal. Presumably, the plaintiffs no longer receive the benefits of a "pooled-risk" fund once they have withdrawn their contributions, because beneficiaries of the segregated fund will receive payments only up to the amount actually remaining in the fund; the Trust will not cover claims once the segregated fund is exhausted. The record simply does not support the claim that the interest earned *after* the time of segregation is compensation for the Trust's coverage of risk *prior* to withdrawal. Because the defendants have not offered clear actuarial support for viewing interest income that accrued after segregation as payment for past risk, they cannot prevail on summary judgment.

Finally, the defendants contend that the recognized statutory power of pension fund trusts to charge a withdrawing employer an exit fee in certain circumstances, pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C. § 1381 *et seq.,* supports recognition in this case of the lesser power for the trustees to interpret the Trust agreement so as to withhold investment income. *See Transcript of Oral Argument,* Doc. No. 23, at 22–24. But, as counsel for the defendants pointed out in oral argument, the exit fee provisions under the MPPAA extend only to the pension fund context and

---

**6.** The structure of the defendants argument is as follows: Wheaton's participation in the "pooled-risk" fund is analogous to an automobile owner's purchase of automobile insurance. Just as an insurance-purchaser has no claim at the end of an insurance period to the difference between the cost of her insurance premiums and whatever insurance payments she received during the course of coverage, so Wheaton has no claim upon withdrawal to payments that were allocated to cover risks during the course of Wheaton's participation in the "pooled-risk" Trust. Following the analogy, the defendants must regard the investment income as part of the insurance premium.

not to the welfare benefit context. *See Transcript of Oral Argument,* Doc. No. 23, at 23–24; *see also* 29 U.S.C. § 1381, *et seq.* (1980). There is neither evidence on the record nor any provision in the MPPAA that supports the claim that the Trust could have charged the plaintiffs an exit fee. The structure of the defendants argument—that the "greater power includes the lesser"—cannot withstand the absence of the Trust's possessing the greater power.

### Conclusion

The language of the Trust agreement provides sufficient reason for a reasonable factfinder to conclude that the trustees' interpretation of the withdrawal provisions is clearly unreasonable. On this basis, summary judgment must be denied.